UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JEFFREY HARDY,                          )
                                        )
                 Petitioner,            )
                                        )
v.                                      )        Civil Action No. 01-cv-10794-PBS
                                        )
MICHAEL MALONEY,                        )
                                        )
                 Respondent.            )
_____)

REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS CORPUS

February 12, 2018

Boal, M.J.

On May 9, 2001, Jeffrey Hardy, who is currently serving a life sentence at a

Massachusetts correctional facility, petitioned this Court for a writ of habeas corpus pursuant to

28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996

("AEDPA").  Docket No. 1 ("Petition").[1]  Hardy raised nine claims in his Petition, seven of

which remain before this Court.  Respondent Michael Maloney opposes the Petition.  Docket No.

67.  For the reasons set forth below, this Court recommends that the District Judge DENY the

Petition.[2]

I.      PROCEDURAL HISTORY

Hardy was charged with murder in the first degree by reason of deliberate premeditation

and extreme atrocity or cruelty, and armed robbery.  Supplemental Answer ("S.A.") at 1-2.  On

_____

[1] The Petition is accompanied by a 54-page addendum, which is cited herein as "Pet. Add."
[2] On November 30, 2015, the District Judge referred this case to the undersigned for full pretrial
case management and a report and recommendation.  Docket No. 54.

1

March 30, 1995, after a two-week trial, a Middlesex County jury convicted Hardy of first degree

murder.[3]  S.A. at 2, 6.  Hardy filed a direct appeal.  He also filed a motion for a new trial on

August 12, 1997, which the Massachusetts Superior Court denied on December 14, 1998.  S.A.

at 7.  In January 1999, he appealed that denial.  Id.  On May 9, 2000, the Supreme Judicial Court

("SJC") denied relief under G.L. c. 278 § 33E[4] and affirmed both Hardy's conviction and the

denial of his motion for a new trial.  Commonwealth v. Hardy, 431 Mass. 387 (2000) ("Hardy

I").

On May 9, 2001, Hardy, represented by counsel, filed the Petition asserting the following

grounds for relief:

(1)     the prosecutor's comment "misstating the evidence that the Supreme Judicial Court
        warned an immunized witness that he 'better not lie'" violated his Sixth and
        Fourteenth Amendment rights ("Ground One") (Pet. Add. at 1–14);

(2)     the prosecutor improperly vouched for the credibility of an immunized witness, in
        violation of his Sixth and Fourteenth Amendment rights ("Ground Two") (Id. at 14–
        17);

(3)     the trial judge erred in allowing the Commonwealth to introduce evidence of co-
        defendants' statements to witness Steven Murphy in violation of Bruton v. United
        States, 391 U.S. 123 (1968) ("Ground Three") (Pet. Add. at 17–33);

(4)     the trial judge violated Hardy's Sixth and Fourteenth Amendment rights by denying
        Hardy's motion for a mistrial based on two spectators yelling, "Jeff Hardy is a

---

[3] Hardy was acquitted of the armed robbery charge.  S.A. at 1, 6.

[4] Section 33E provides, in pertinent part:

> In a capital case [such as the case here] the entry in the supreme judicial court
> shall transfer to that court the whole case for its consideration of the law and the
> evidence.  Upon such consideration the court may, if satisfied that the verdict was
> against the law or the weight of the evidence, or because of newly discovered
> evidence, or for any other reason that justice may require (a) order a new trial or
> (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to
> the superior court for the imposition of sentence. . . .

G.L. c. 278 § 33E.

murderer!" in the presence of the jury during their view of the crime scene ("Ground Four") (Id. at 34–38);

(5)    the trial judge violated Hardy's Sixth and Fourteenth Amendment rights by denying his request for an instruction on his theory of defense ("Ground Five") (Id. at 38–45);

(6)    the prosecutor violated Hardy's Sixth and Fourteenth Amendment rights when he called attention to Hardy's failure to produce third party culprit evidence ("Ground Six") (Id. at 45–47);

(7)    the trial judge violated Hardy's Sixth and Fourteenth Amendment rights by denying his motion for a new trial and holding that he had no right to have the jury polled ("Ground Seven") (Id. at 47–50);

(8)    the Commonwealth's late disclosure of Hardy's alleged statement to the victim, "Now maybe you'll shut the fuck up", violated Hardy's Sixth and Fourteenth Amendment rights ("Ground Eight") (Id. at 50–51); and

(9)    the trial judge violated Hardy's Fifth, Sixth and Fourteenth Amendment rights by instructing the jury on the issue of consciousness of guilt based on the prosecutor's use of Hardy's pre-arrest statements denying involvement in a drug transaction ("Ground Nine") (Id. at 51–53).

On September 5, 2003, Respondent moved to dismiss the Petition.  Docket No. 10.  On May 18, 2004, the District Court denied the motion and stayed the case, noting that six of the nine claims were not exhausted.  Docket No. 19.  On September 18, 2007, Respondent requested that the stay be lifted and the District Court issue an order to show cause why the case should not be dismissed for failure to prosecute.  Docket No. 24.  On October 1, 2007, the District Court issued such an order, and, in response, Hardy stated that his new counsel was in the process of reviewing the record.  Docket No. 28 at 2.  He asked the Court to continue the stay.  Id.

On July 28, 2008, the District Court stayed the case, but ordered Hardy to file a timeline for exhausting claims in state court within thirty days or risk the Court lifting the stay.  On August 29, 2008, Hardy stated that he would file a state court motion for a new trial by November 1, 2008, Docket No. 31, but was later granted a one-month extension of that deadline.

Docket No. 32.

On November 26, 2008, Hardy filed a second motion for a new trial in the Superior Court, which was denied on February 18, 2010.  S.A. at 7-8.  In March 2010, Hardy appealed. Id. at 8.  His petition for review was granted by a single justice of the SJC on June 11, 2010.[5]  Id. The SJC ultimately affirmed the denial of Hardy's motion for a new trial on March 15, 2013. S.A. at 8; Commonwealth v. Hardy, 464 Mass. 660, 671 (2013) ("Hardy II").  Hardy filed a petition for writ of certiorari with the Supreme Court, which was denied on October 7, 2013. S.A. at 14; Hardy v. Massachusetts, 134 S.Ct. 248 (2013).

On October 9, 2014, Hardy moved to amend the Petition.  Docket No. 37.  This Court recommended that the District Judge deny the motion,  Docket No. 45, and on September 2, 2015, the District Judge adopted that report and recommendation without objection.  Docket No. 47.

On May 30, 2016, Hardy voluntarily moved to dismiss Grounds Seven and Eight of the Petition, conceding that they were not exhausted.  Docket No. 61.  He also filed a second memorandum in support of his Petition,  Docket No. 62, which Respondent opposed on November 18, 2016.  Docket No. 67.  On December 9, 2016, this Court recommended that the motion to dismiss Grounds Seven and Eight be granted.  Docket No. 68.  On January 6, 2017, the District Judge adopted this Court's report and recommendation without objection.  Docket No. 69.

---

[5] On March 28, 2011, while Hardy's second appeal was pending before the SJC, the District Court issued an order to show cause why the federal case should not be dismissed in light of the fact that no docket activity had occurred since October 2008.  Hardy subsequently filed a status report explaining that his direct appeal was pending.  Docket No. 34.  On October 6, 2011, the District Court stayed the case pending the resolution of Hardy's appeal in state court.  Docket No. 35.

4

II.   <u>FACTUAL BACKGROUND</u>

The SJC found the following facts:[6]

The victim's body was discovered in a park in Medford on April 28, 1994, at about 5:30 A.M. The victim's body had a total of seventy-nine stab wounds to the head, face, neck, chest, arms, legs, and back, as well as a gunshot wound to the face. The medical examiner testified that it was possible the victim had been alive during the infliction of all the injuries.

The Commonwealth's primary witness at trial was Christopher Rogovich, who had been granted immunity by a single justice of this court. Rogovich testified as follows. On the day of the murder, Rogovich, the defendant, Gerald Sullivan, Richard Allison, and the victim, among others, spent the afternoon playing basketball and drinking beer. Sometime during the afternoon, Sullivan and the defendant left to buy some marijuana treated with PCP, or "angel dust." Sullivan and the victim smoked some of the drug that afternoon, and again in the evening, while the group was at a friend's house. The effects of the drug were not very strong, and the victim talked about how the drug was "fake," that Sullivan and the defendant had "got beat," and were "chumps" and "idiots." The victim persisted with similar comments throughout the day, and seemed to upset the defendant. While the group was at the friend's house, the defendant left for approximately fifteen minutes, and when he returned he showed Rogovich a gun that he had tucked into his pants.

Rogovich further testified that the group subsequently went to a local bar. After staying about one hour, the defendant said, "Let's get out of here, let's go for a ride." The defendant did not want the victim to go along with them, but the victim caught up to the defendant, Rogovich, Allison, and Sullivan as they got into the defendant's car. The defendant dropped off Rogovich and the victim a short distance from a Dunkin' Donuts and whispered to Rogovich, "Try to lose [the victim]." Eventually, all five returned to the car, but the defendant wanted the victim to go home, and the two argued about it. At one point, the victim got out of the car, calling the defendant and Sullivan "fuckin' punks" as he did so. The defendant yelled back, "Do you want to come ... ? Get in the fuckin' car." The victim got into the car and the defendant sped off. After driving for a while, the defendant pulled the car over, and the defendant, Sullivan, and Allison got out of the car, walked a few feet away, and spoke together. When they got back into the car, the defendant said, "We got to go meet the dealer." The defendant drove to a nearby park, directed everyone to a certain area, and told them where to stand, saying that the drug dealer "should be coming this way." When Rogovich turned

---

[6] Absent clear and convincing evidence to the contrary, the recitation of the facts by the SJC is presumed to be correct.  <u>See</u> 28 U.S.C. § 2254(e)(1); <u>Evans v. Thompson</u>, 518 F.3d 1, 3 (1st Cir. 2008); <u>Gunter v. Maloney</u>, 291 F.3d 74, 76 (1st Cir. 2002).

around, Sullivan was pointing a gun at the victim's head. Rogovich heard three clicking noises and then saw the defendant grab the gun. Rogovich had started to move away, and when he turned around to look, he saw the defendant shoot the victim and heard the victim say, "Hardy shot me in the mouth." The defendant replied, "Now you'll shut your fuckin' mouth." When Rogovich turned back again, he saw the defendant, Allison, and Sullivan on top of the victim making stabbing motions, and he heard Sullivan say, "Get his wallet." Rogovich returned to the defendant's car where he was joined shortly by Sullivan, who was carrying a bloody knife. Sullivan told Rogovich to get in the car, drove him to a nearby house, and called for a taxi for him. The next day, the defendant stopped by Rogovich's house and told him, "Don't say nothing, they'll get you ten years down the line for this...."

In addition to Rogovich, the Commonwealth's other chief witness was Steven Murphy. Murphy testified that around 9:30 P.M. on the night of the murder, the defendant and Sullivan came to his house to retrieve a gun, and that the defendant said they needed it because they had been "ripped off" on a drug deal. Around midnight, Allison showed up at Murphy's house, nervous and sweating. Five to ten minutes later, Sullivan and the defendant arrived, and Sullivan, Allison, and Murphy went into a bedroom to talk. Sullivan asked Allison how much money they had gotten, Allison counted some money, gave some to Sullivan, and told him to give one-half to the defendant. Allison and Sullivan left by separate taxis. An hour or so later, Murphy woke the defendant, who had fallen asleep on the living room floor, and asked him what had happened. The defendant said, "We did what we had to do." When Murphy saw the defendant the next day, he told the defendant, "That was a pretty sick thing that you did." The defendant responded, "Did you hear how many times we got him? Eighty times."

The defendant presented a defense of alibi and testified at trial. His account of the day of the murder was, in large part, consistent with Rogovich and Murphy's account, except for the following. First, the defendant denied that anybody had thought the angel dust was fake or that the victim had taunted him about that. The defendant testified that Sullivan had said the drug was "weird," but that the drug dealer had subsequently explained the problem and how to remedy it. Second, the defendant denied retrieving a gun. Third, the defendant testified that he and Sullivan alone had left the bar at 11 P.M. and gone to the Dunkin' Donuts, and that they had done so in an attempt to buy more drugs. The defendant testified that from the Dunkin' Donuts, Sullivan had dropped him off at his grandfather's house, that Sullivan had picked him up about forty-five minutes later, and that they had driven to Murphy's house from there. Finally, the defendant denied that Allison was present at Murphy's apartment that night, and he denied making any inculpatory statements to Murphy. The defendant's grandfather corroborated the defendant's alibi.

The Commonwealth introduced evidence contradicting the defendant's account of

the evening, including (1) two women, who had spent the day of the murder with the group of men, testified that all five men left the bar at the same time; (2) one of the women testified further that Allison returned to the bar about one hour later, and that she had walked to Murphy's house with him; (3) a third female witness testified that she saw and briefly spoke with the victim at the Dunkin' Donuts at about 11 P.M. on the night of the murder; and (4) two narcotics officers, who were on an unrelated surveillance at the Dunkin' Donuts on the night of the murder, testified that they observed the defendant's car in the parking lot at about 11 P.M., and that they saw two men cross the street and eventually get into the car.

****

At the start of the trial, while the jury were on a view of the park where the victim's body was found, spectators shouted some words at the jury from across a field. The judge immediately instructed the jury to disregard the comments. When they returned to the courthouse, the judge conducted an individual voir dire of all the jurors, during which she asked the jurors what, if anything, they had heard, whether it had any influence on them, and whether they were able to remain fair and impartial. Of the sixteen jurors, fourteen stated that they had heard either the defendant's name, the word murderer, or the phrase, "Jeffrey Hardy is a murderer." All jurors denied that the incident had affected or influenced them and all affirmed their ability to remain fair and impartial. At the close of the voir dire, the defendant moved for a mistrial. The judge concluded that the jury remained indifferent and denied the motion.

****

Steven Murphy testified, over the defendant's objection, that, shortly after they arrived at his house on the night of the murder, both Richard Allison and Gerald Sullivan separately had confessed to him. Murphy testified that Allison had told him that he, Sullivan, Rogovich, and the defendant had just killed the victim. Murphy also testified that Sullivan, while not implicating the defendant, described how he (Sullivan) had participated in the killing. The defendant was not present in the room when either statement was made. The judge allowed the testimony under the joint venture exception.

****

At trial, the Commonwealth introduced evidence that the defendant denied he was at the Dunkin' Donuts on the night of the murder until he was shown the "teletype item" indicating that the police "had run" his registration, at which point he admitted to the police that he had lied.

Hardy I, 431 Mass. at 388-91, 393, 394 (internal citations omitted).  During closing

arguments, the prosecutor stated (objected-to portion in italics):

> Now, defense counsel has spent a lot of time in this trial trying to shift attention away from [the defendant]: "Look at the Charlestown kids. What about the Somerville Project kids? ... Well, let me ask you this, ladies and gentlemen. *What scintilla of evidence have you heard that could lead you to conclude that the Charlestown kids or the Somerville Project kids were in any way connected with the murder of [the victim]*."

Id. at 396 n.4.  In connection with Rogovich, the prosecutor stated:

> Why do you think Chris Rogovich took the Fifth Amendment? He was there. He's telling you the truth.
>
> ****
>
> Was it the threats that made Chris Rogovich come forward? The evidence says no. The evidence says that Chris Rogovich only testified at this trial after the Supreme Judicial Court of our Commonwealth said, "Mr. Rogovich, you are going to testify or you're going to be held in contempt and go to jail, and you'd better not lie.... You could be prosecuted for perjury."

Id. at 396 nn. 6, 7.

III.     STANDARD OF REVIEW

    A.     Habeas Corpus Standard Of Review

The AEDPA presents a "formidable barrier" limiting the availability of habeas relief where state courts have adjudicated the merits of a prisoner's claims.  Burt v. Titlow, 134 S.Ct. 10, 16 (2013).  Hardy cannot obtain federal habeas relief under 28 U.S.C. § 2254(d) for any claim that a state court "adjudicated on the merits" unless he can show that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Rashad v. Walsh, 300 F.3d 27, 34 (1st Cir. 2002).  In other words, state court decisions merit substantial

deference.

As the Supreme Court repeatedly has emphasized, such deference results in a federal habeas corpus standard that is "difficult to meet," with the petitioner carrying a heavy burden of proof.  Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen v. Pinholster, 563 U.S. 170, 181 (2011).  If a state court's decision "was reasonable, it cannot be disturbed."  Hardy v. Cross, 565 U.S. 65, 72 (2011); see Parker v. Matthews, 567 U.S. 37, 38 (2012) (emphasizing federal habeas courts may not "second-guess the reasonable decisions of state courts" (internal quotation and citation omitted)).  When applying this strict standard, a court must presume that the state court's factual findings are correct, unless the petitioner has rebutted that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Miller–El v. Cockrell, 537 U.S. 322, 340–41 (2003).

The state court is not required to cite, or even have an awareness of, governing Supreme Court precedents, "so long as neither the reasoning nor the result of [its] decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002); cf. Harrington, 562 U.S. at 100 ("§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'" and entitled to deference).  For a habeas petitioner to prevail under this daunting standard, the state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court.  Williams v. Taylor, 529 U.S. 362, 404–05 (2000); see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).[7]

---

[7] In determining what constitutes "clearly established federal law", petitioners can generally look to all settled federal law as of the time the state court conviction at issue became "final".  See Williams, 529 U.S. at 390; Teague v. Lane, 489 U.S. 288, 295-96 (1989).  That occurs upon the completion of (or the running of the time for filing) certiorari proceedings in the Supreme Court following state court direct review.  See Williams, 529 U.S. at 390; Teague, 489 U.S. at 295-96.  However, Supreme Court decisions issued after finality may be considered if they shed light on

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams, 529 U.S. at 405, or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result." Id. at 406.

The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  When making the "unreasonable application" inquiry, federal habeas courts must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.  An unreasonable application of the correct rule can include the unreasonable extension of that rule to a new context where it should not apply, as well as an unreasonable failure to extend the rule to a new context where it should apply. Id. at 407.  It cannot, however, include a decision by a state court not "to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles, 556 U.S. at 122.

IV.   DISCUSSION

A.  Exhaustion: Grounds One, Two, Five And Nine

Respondent argues that Grounds One, Two, Five and Nine are not properly before this Court due to a failure to exhaust.[8]  Docket No. 67 at 20-26.

_____

the meaning and application of a rule that the Supreme Court had previously established before the state court decision became final.  See, e.g., Johnson v. Bagley, 544 F.3d 592, 599 (6th Cir. 2008) (considering Supreme Court opinions that postdate state court decision on ineffective assistance claim because they did not rest on new law but instead applied the "clearly established" precedent of Strickland); Williams v. Allen, 542 F.3d 1326, 1338 n.7 (11th Cir. 2008) (same).

[8] Respondent concedes that Grounds Three, Four and Six were properly exhausted.  Docket No. 67 at 10.

1. Procedural Background

On May 18, 2004, the District Court found that Hardy had not exhausted six grounds in the Petition[9] because their federal nature was not presented to the SJC on direct review. Docket No. 19. Judge Keeton stayed the case in order for Hardy to do so. Id.[10] On November 26, 2008, Hardy filed a motion for a new trial in Superior Court so as to raise the unexhausted claims, S.A. at 275-328, which that court denied. S.A. at 7. Hardy appealed the denial on March 8, 2010, S.A. at 8, and in 2013, the SJC affirmed. Hardy II, 464 Mass. at 671.

2. Legal Standard

Habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991); accord 28 U.S.C. § 2254(a). It "is not an ordinary error-correcting writ" or a mere extension of a petitioner's direct appeals; it "exists to rescue those in custody from the failure to apply federal rights, correctly or at all." Nadworny v. Fair, 872 F.2d 1093, 1096 (1st Cir. 1989). Thus, "[f]ederal courts sitting in habeas must accept state court rulings on state law issues." Rodriguez v. Spencer, 412 F.3d 29, 37 (1st Cir. 2005); see also Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006) ("Errors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal constitutional claim raised.").

It is incumbent upon the habeas petitioner to frame his claims "in terms of violations of federal law," both in his federal petition and when exhausting the claims in state court. Cf. Kater, 459 F.3d at 61-62. A habeas petitioner bears the "heavy burden" of demonstrating the fulfillment of the exhaustion requirement. Barresi v. Maloney, 296 F.3d 48, 51 (1st Cir. 2002).

---

[9] These grounds were numbers One, Two, Five, Seven, Eight and Nine.
[10] On January 6, 2017, the District Court dismissed numbers Seven and Eight. Docket No. 69.

In order to satisfy the exhaustion requirement, "[i]t is not enough merely to raise an issue before an intermediate court; one who seeks to invoke the federal habeas power must fairly present – or do his best to present – the issue to the state's highest tribunal." Mele v. Fitchburg Dist. Court, 850 F.2d 817, 820 (1st Cir. 1988) (citations omitted). In Massachusetts, that standard is met "by 'fairly presenting' a federal claim 'within the four corners of the [application for further appellate review to the SJC].'" Clements v. Maloney, 485 F.3d 158, 162 (1st Cir. 2007) (citing Mele, 850 F.2d at 823); Adelson v. DiPaola, 131 F.3d 259, 263 (1st Cir. 1997) (In analyzing exhaustion, "the decisive pleading is the application for further appellate review ..."). Claims "omitted entirely from an [application for further appellate review] cannot be exhausted." See Mele, 850 F.2d at 820-23.

The First Circuit has identified at least five ways in which a habeas petitioner may satisfy the "fair presentment" requirement: (1) reliance on a specific provision of the Constitution, (2) substantive and conspicuous presentation of a federal constitutional claim, (3) on-point citation to federal constitutional precedents, (4) identification of a particular right specifically guaranteed by the Constitution, or (5) assertion of a state-law claim that is functionally identical to the federal constitutional claim. Coningford v. Rhode Island, 640 F.3d 478, 482 (1st Cir. 2011) (citing Scarpa v. Dubois, 38 F.3d 1, 6 (1st Cir. 1994)). "The appropriate focus . . . centers on the likelihood that the presentation in state court alerted that tribunal to the claim's federal quality and approximate contours." Id. (citing Nadworny, 872 F.2d at 1098) (emphasis in original).

In his state court papers, Hardy argued that his first appellate counsel was "ineffective in not alerting the state court to the federal constitutional nature" of Grounds One, Two, Five and Nine. S.A. at 240-45. In so doing, he also addressed the federal nature of the claims. In particular, Hardy presented each of these claims by relying on specific provisions of the U.S.

Constitution in the following manner: the prosecutor's closing argument violated his "right to a fair trial under the Sixth and Fourteenth Amendments" (Ground One); the prosecutor improperly vouched for the credibility of a key witness in violation of his "Sixth and Fourteenth Amendment rights" (Ground Two); the trial court's failure to provide a <u>Bowden</u>[11] instruction violated his "Sixth and Fourteenth Amendment rights" (Ground Five); and the trial court's consciousness of guilt instruction violated his "Fifth, Sixth and Fourteenth Amendment rights" (Ground Nine). S.A. at 241-42, 244. Hardy also cited to cases that discuss federal constitutional precedents. <u>Id.</u> (citing <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 639 (1974); <u>Matthews v. United States</u>, 485 U.S. 58, 63 (1988)) (some citations omitted). Further, in his brief to the SJC, he explicitly acknowledged the staying of the instant case because these claims had not been properly presented in a federal constitutional context. S.A. at 222.

Respondent argues that these four grounds remain unexhausted because Hardy raised them in one overarching ineffective assistance of counsel claim in his 2010 state appeal, but brought them as four separate and independent claims in the Petition. Docket No. 67 at 20-26. That argument is unavailing. Not only did Hardy's pleadings create a likelihood that the state courts were alerted to the federal nature of the claims, the SJC in fact ruled on them. <u>See</u> S.A. at 499-500. The legal theories and arguments that Hardy presented in state court and that are before this Court on habeas review are the same.[12] Accordingly, this Court finds that Hardy

---

[11] <u>Commonwealth v. Bowden</u>, 379 Mass. 472 (1980).

[12] Moreover, the cases that Respondent cites in support of his argument that Grounds One, Two, Five and Nine remain unexhausted are inapposite. <u>See</u> Docket No. 67 at 20-26 (citing <u>Rose v. Palmateer</u>, 395 F.3d 1108, 1112 (9th Cir. 2005) (petitioner did not adequately present separate Fifth Amendment claim where he admittedly only raised claim "indirectly" in conjunction with ineffective assistance of counsel claim and state appeals court did not rule directly thereon); <u>Wilder v. Cockrell</u>, 274 F.3d 255, 261 (5th Cir. 2001) (petitioner did not fairly present <u>Chambers</u> claim in tandem with ineffective assistance of counsel claim where he cited to <u>Chambers</u> only

fairly presented the federal nature of Grounds One, Two, Five and Nine to the state courts.

B. Grounds One, Two And Six: Prosecutorial
   Misconduct In Closing Arguments

In Grounds One, Two and Six, Hardy argues that the prosecutor made comments during closing argument that violated his Sixth and Fourteenth Amendment rights to a fair trial.  Pet. at 5; Pet Add. at 1-17, 45-46; Docket No. 62 at 5-6, 9.  This Court disagrees.

The "clearly established Federal law" relevant here is the Supreme Court's decision in Darden v. Wainwright, 477 U.S. 168 (1986), which explained that a prosecutor's improper comments will be held to violate the Constitution only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Parker, 567 U.S. at 45 (quoting Darden, 477 U.S. at 181).  Indeed, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned."  Darden, 477 U.S. at 181 (citation omitted).

The Darden standard is a "very general" one, and affords courts leeway in reaching outcomes on a case-by-case basis.  Parker, 567 U.S. at 48 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Courts must consider the prosecutor's comments in the context of the trial as a whole, including whether the trial judge attempted to correct any erroneous impressions that the jury may have had to the challenged comments.  See Darden, 477 U.S. at 181-83; Donnelly, 416 U.S. at 644.

---

once and only so as to provide an additional basis for finding ineffective assistance); Russi v. Rozum, No. 06-2730, 2007 WL 1876533, at *3 (E.D. Pa. June 27, 2007) (finding Brady claim within overarching ineffective assistance of counsel claim procedurally defaulted because petitioner admitted ineffective assistance was the "main issue" and did not raise Brady argument on appeal)).

1.   Grounds One And Two: Prosecutor's
     Comments On Witness Credibility

In Ground One, Hardy claims that the prosecutor improperly suggested that the SJC immunized a witness, Chris Rogovich, and told him that he "better not lie".  Pet. Add. at 1-14; Docket No. 62 at 5-6.  Hardy maintains that, with this statement, the prosecutor improperly used the credibility of the SJC to vouch for the witness.  In Ground Two, Hardy argues that the prosecutor violated Hardy's rights when he suggested to the jury that Rogovich was telling the truth.  Pet. Add. at 14-17; Docket No. 62 at 6.  In this regard, Hardy posits that the prosecutor himself inappropriately vouched for the credibility of the witness.

In Hardy II, the SJC discussed the federal nature of Ground One and rejected it.  464 Mass. at 670.[13]  The SJC acknowledged Hardy I, and its rejection of the same claim under state law.  Id. at 669-70.  It then asserted that "this [state] standard is reflected in decisions considering similar issues under the U.S. Constitution."  Id. at 670.  It further stated: "Because resolution of the defendant's claim under Massachusetts law was consistent with this standard, our consideration of Federal law would not have changed the outcome."  Id.

In Hardy I, the SJC was troubled by the prosecutor's use of the SJC's authority to vouch for Rogovich's credibility, but analyzed whether a new trial was necessary, assessing the effect of the prosecutor's statement "in the context of the argument and the case as a whole".  Hardy I, 431 Mass. at 396.  Specifically, Hardy I evaluated the strength of the Commonwealth's case, whether the judge's actions mitigated the error, and the extent to which the errors related to central, rather than collateral, issues in the case.  Id.  The SJC concluded that the judge's curative

---

[13] The SJC did not explicitly discuss Ground Two in Hardy II, though it generally rejected the argument that its assessment of the prosecutor's closing argument would have changed under federal law.  See Hardy II, 464 Mass. at 669-70.

instructions were specifically targeted at correcting the errors created by the prosecutor's comments.[14]  Id. at 398.  The SJC determined that "while the prosecutor's improper arguments were egregious, they were not so prejudicial as to be irremediable, and the judge's approach was sufficiently aggressive to ameliorate the error created by them."  Id.

Moreover, in Hardy I, the SJC, citing one of its previous decisions, found that the prosecutor did not exceed the scope of a permissible argument when stating that Rogovich was telling the truth.  Hardy I, 431 Mass. at 396 (citing Commonwealth v. Chavis, 415 Mass. 703, 713 (1993)).[15]  At trial, throughout cross examination and during closing arguments, defense counsel attempted to undermine Rogovich's credibility.  See, e.g., S.A. at 1792-1825, 1837-1917, 3641-49, 3657, 3672-73.  At the start of closing arguments, for example, defense counsel told the jury: "[The Commonwealth has] to convince you, beyond a reasonable doubt that Chris

---

[14] Those instructions were as follows:

> You have heard reference in this case to the term immunity, and we have had reference to the term immunized witness. Immunity is a process by which a petition is brought before the Single Justice of the Supreme Judicial Court, which is the court that handles that, simply, while the Grand Jury is still in session. And after consideration of the petition, that justice may grant, to a particular witness, immunity.

> During argument, the Commonwealth in its form, I suggest, personalized that as the Supreme Judicial Court instructing a particular witness. That was a personalization of that and it is not in that personalized form. This goes up by petition and the petition is allowed and it comes back in a form in which there is a statement by the justice, as with any other judge, instructing the limitations and under what circumstances.

Hardy I, 431 Mass. at 398 n.10; S.A. at 3749-50.

[15] In Chavis, the SJC held that a prosecutor may not comment on the credibility of a witness, but may draw inferences on the evidence developed at trial, and respond to an attack on the credibility of a witness.  Chavis, 415 Mass. at 713.  It then concluded that the prosecutor there could legitimately argue that, contrary to defense counsel's assertion, a witness was telling the truth.  Id. at 714.

Rogovich was telling the truth.  Because in order to buy the Commonwealth's story, you have to believe Chris Rogovich."  S.A. at 3641-42.  Against this backdrop, the SJC determined that the prosecutor did not improperly vouch for Rogovich's credibility.  See Hardy I, 431 Mass. at 396. This finding is consistent with Darden's concept of "invited response", which speaks to how courts should view "objectionable content" in a prosecutor's statement if "invited by" or "responsive to" an argument by the defense.  Darden, 477 U.S. at 182 (citing United States v. Young, 470 U.S. 1, 13 (1985)).  Indeed, the Supreme Court has recognized that, if a prosecutor's remarks are "invited," and do no more than "respond substantially in order to 'right the scale,'" such comments do not warrant reversing a conviction.  Young, 470 U.S. at 12-13 (explaining that "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole).

The SJC's decision was neither contrary to nor an unreasonable application of federal law, and therefore, Grounds One and Two should be denied.

     2.   Ground Six: Burden Of Proof
              And Third Party Culprit Evidence

In Ground Six, Hardy contends that the prosecutor impermissibly shifted the burden of proof when suggesting that Hardy had a duty to present some evidence of his innocence.  Pet. Add. at 45-47; Docket No. 62 at 9.  Specifically, during his closing argument, the prosecutor stated (objected-to portion in italics):

> Now, defense counsel has spent a lot of time in this trial trying to shift attention away from [the defendant]: 'Look at the Charlestown kids. What about the Somerville Project kids? ... Well, let me ask you this, ladies and gentlemen. *What scintilla of evidence have you heard that could lead you to conclude that the Charlestown kids or the Somerville Project kids were in any way connected with the murder of [the victim]*.

Hardy I, 431 Mass. at 396 n.4; S.A. at 3683-84.  Hardy maintains that the judge's instructions

concerning the burden of proof did not cure the harm that these comments caused.  Pet. Add. at 45-47.

Under the Darden standard, the SJC's decision was neither contrary to nor an unreasonable application of clearly established federal law.  Darden, 477 U.S. at 181.  The Hardy I court found that the prosecutor did not improperly comment on Hardy's failure to produce evidence, and, "in any event, the judge gave comprehensive instructions on the burden of proof." Hardy I, 431 Mass. at 395-96.  In so finding, the SJC relied on several of its previous decisions, each of which supports the conclusion that the prosecutor's remarks here were not improper when viewed in the context of the case as a whole.  Id. (citing Commonwealth v. Moore, 408 Mass. 117, 128 (1990) (against background of entire case, prosecutor allowed to comment on "inherent unbelievability" of defendant's story);  Commonwealth v. Smith, 404 Mass. 1, 7 (1989) (prosecutor entitled to suggest, in response to defendant's closing argument, that police officer would not commit perjury); Commonwealth v. Borodine, 371 Mass. 1, 9 (1976) (judge's instructions on burden of proof adequately protected defendant's rights in light of prosecutor's improper comments)).  The SJC's conclusion therefore accords with Supreme Court precedent on the issue.  See Darden, 477 U.S. at 182; Young, 470 U.S. at 12-13.  Hardy has not pointed to any Supreme Court precedent clearly on point and contrary to the SJC's conclusion.  Habeas review of Ground Six should therefore be denied.

C.  Ground Three: Admission Of Co-Defendants' Confessions

In Ground Three, Hardy claims that the trial court erred when admitting two co-defendants' confessions without requiring that they testify.  Pet. at 6; Pet. Add. at 17-33; Docket No. 62 at 6-7.  Specifically, Hardy alleges that the trial court, in admitting these confessions under the joint venture exception to the hearsay rule, violated state law, his Sixth Amendment

right of confrontation as articulated in Bruton and his due process rights.  Id.

        1.  *Bruton* Violation

The Sixth Amendment states that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.  U.S. Const. amend. VI.  In Bruton, the Supreme Court held that a criminal defendant is deprived of this right when a non-testifying co-defendant's facially incriminating confession, naming the defendant as a participant, is introduced at their joint trial.  Bruton, 391 U.S. at 131.  However, Bruton "does not bar the use of a co-conspirator statement made in furtherance of the conspiracy and admissible under a traditional hearsay exception."  See United States v. De La Paz-Rentas, 613 F.3d 18, 29 (1st Cir. 2010) (collecting cases).

Here, the confessions at issue were not admitted at a joint trial.  Indeed, Hardy's trial was severed from that of his co-defendants at his request.  S.A. at 4; see Hardy I, 431 Mass. at 394 n.3.  The Commonwealth did not oppose the motion to sever, and, at the hearing on that motion, acknowledged a potential Bruton problem if the defendants were tried together.  Hardy I, 431 Mass. at 394 n.3.  The SJC correctly found that such action by the Commonwealth did not preclude it from subsequently moving in limine to introduce inculpatory statements, particularly where there was a valid basis for introducing the statements.  Id. (citing Commonwealth v. Rose, 47 Mass. App. Ct. 168, 175 (1999)).  In this case, the SJC found that the Commonwealth had a "valid basis" because it had established, by other admissible evidence, the existence of a joint venture and statements made in the pendency of the venture and in furtherance of its goal.  Id. at 394.  The SJC's rejection of this claim was proper and therefore there was no Bruton violation.

        2.  Joint Venture Exception

To the extent Hardy argues that the state court misapplied the joint venture exception to

the hearsay rule, such argument does not generally form a basis for habeas relief.  Evans v. Verdini, 466 F.3d 141, 145 (1st Cir. 2006).  Errors of state evidentiary law may form a basis for federal habeas relief only if they rendered the trial so fundamentally unfair as to violate due process.  Coningford, 640 F.3d at 484.  Here, as explained by the SJC, the trial court properly admitted the confessions.  Thus, Ground Three should be denied.

D.  Ground Four: Denial Of Motion For Mistrial

Hardy contends that his constitutional right to an impartial jury was violated when spectators shouted at jurors while the jurors were on a view of the crime scene.  Pet. Add. at 34-37; Docket No. 62 at 7-8.  He maintains that this incident was grounds for a mistrial, and the state court's failure to do so amounted to a constitutional error.  Pet. Add. at 34-37; Docket No. 62 at 7-8.

The Sixth Amendment explicitly guarantees a criminal defendant the right to trial by an impartial jury.  Neb. Press Ass'n v. Stuart, 427 U.S. 539, 551 (1976).  The Supreme Court has therefore established a constitutional rule that forbids a jury from being exposed to extraneous influences.  Turner v. Louisiana, 379 U.S. 466, 472–73 (1965); Remmer v. United States, 347 U.S. 227, 229 (1954).  The requirement that "a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."  Turner, 379 U.S. at 472 (citation omitted).

In a habeas corpus proceeding, a state court's findings on whether, and how, extraneous matters affected jury deliberations deserve a high measure of deference.  Mahoney v. Vondergritt, 938 F.2d 1490, 1492 (1st Cir. 1991) (citing Rushen v. Spain, 464 U.S. 114, 120 (1983)); see 28 U.S.C. § 2254(e)(1); Smith v. Phillips, 455 U.S. 209, 218 (1982) (citing Sumner v. Mata, 449 U.S. 539, 551 (1981)).  The Supreme Court has concluded that juror impartiality is

a "factual issue" for purposes of section 2254 because it "depends heavily on the trial court's appraisal of witness credibility and demeanor." Thompson v. Keohane, 516 U.S. 99, 110 (1995) (citing Wainwright v. Witt, 469 U.S. 412, 429 (1985); Miller v. Fenton, 474 U.S. 104, 114 (1985)). A federal court is therefore required to presume the correctness of both the trial judge and the appeals court's conclusion that no extraneous influences affected the jurors. Mahoney, 938 F.2d at 1493 n.5.

The Hardy I court stated that the jury's exposure to the spectators' comments "clearly created the potential for prejudice." Hardy I, 431 Mass. at 392. Yet, the SJC noted the trial judge's actions, which included "immediately caution[ing] the jurors to disregard anything they may have heard, and subsequently engag[ing] in a careful and thorough questioning of each juror." Id. Fourteen of the sixteen jurors admitted they heard either Hardy's name, the word murderer, or the phrase, "'Jeffrey Hardy is a murderer.'" Id. at 391. Nonetheless, all of the jurors denied that the incident influenced them, and all affirmed their ability to remain fair and impartial. Id. The judge concluded that the jury remained indifferent and therefore denied Hardy's motion for a mistrial. Id. at 391-92.

The SJC gave "substantial deference to the trial judge" who it determined was in the "best position to evaluate all the circumstances of the [jury's] exposure to the extraneous matter, and its actual prejudicial effect." Id. at 392 (citing Commonwealth v. Daughtry, 417 Mass. 136, 147 (1994)). It ultimately determined that the trial judge's decision to deny Hardy's motion for a mistrial was supported by the record. Id. This conclusion is presumptively correct.

Hardy has presented this Court with no evidence or argument to support the suggestion that the jurors were being untruthful when affirming their respective abilities to remain fair and impartial. See Docket No. 62 at 7-8. In the absence of clear and convincing evidence to the

contrary, this Court must credit the SJC's factual findings, and recommends the denial of Ground Four.

E.   Grounds Five And Nine: Jury Instructions

In Grounds Five and Nine, Hardy argues that the trial judge erroneously instructed the jury by (1) declining to give a <u>Bowden</u> instruction[16] and (2) giving a consciousness of guilt instruction that was unsupported by the record.  Pet. Add. at 38-45, 51-53; Docket No. 62 at 8-10.  Those arguments lack merit.

Because jury instructions in a state trial are typically a matter of state law to which substantial deference is owed, the general rule is that improper jury instructions do not form a proper basis for federal habeas corpus relief.  <u>Bly v. St. Amand</u>, 9 F. Supp. 3d 137, 160 (D. Mass. 2014) (citing <u>Niziolek v. Ashe</u>, 694 F.2d 282, 290 (1st Cir. 1982)).  Improper jury instructions do not form the basis for federal habeas relief unless the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  <u>Estelle</u>, 502 U.S. at 72.  When reviewing a claim of improper jury instructions, a habeas court must look at the instructions "in the context of the instructions as a whole and the trial record."  <u>Id.</u>

1.   Ground Five: <i>Bowden</i> Instruction

Hardy argues that he was denied due process when the trial court refused to give a <u>Bowden</u> instruction on the alleged deficiencies of the police investigation.  Pet. Add. at 38-45; Docket No. 62 at 8-9.  He contends that the trial court's failure to so instruct the jury on an outcome-determinative defense denied him the right to a fair trial.  Pet. Add. at 38-45; Docket No. 62 at 8-9.

---

[16] A <u>Bowden</u> instruction pertains to claimed inadequacies of a police investigation.  <u>See</u> <u>Hardy I</u>, 431 Mass. at 395 (citing <u>Bowden</u>, 379 Mass. at 485-86).

The Due Process Clause and the Sixth Amendment require that a criminal defendant "be afforded a meaningful opportunity to present a complete defense."  Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (citation omitted)).  Therefore, the Supreme Court has established that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  Mathews, 485 U.S. at 63. Nevertheless, there is no clearly established Supreme Court precedent that a trial court must instruct a jury on "a criminal defendant's specific theory as to why it should regard the government's case with skepticism".  See Lao v. Roden, No. 12-11481-NMG, 2014 WL 2767091, at *3 (D. Mass. June 17, 2014).

The SJC reviewed Hardy's Bowden claim twice, and, both times found that the trial court was not required to give such an instruction.  In Hardy II, the SJC stated:

> Bowden does not create a "defense" in the sense that it creates an element of proof that the Commonwealth must prove or disprove beyond a reasonable doubt, such that a particular instruction is required.  Bowden merely recognizes that a defendant is entitled to present evidence that "certain tests were not conducted or certain police procedures not followed [that] could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors."

Hardy II, 464 Mass. at 670 (quoting Commonwealth v. Lao, 460 Mass. 12, 23 (2011)).

In Hardy I, the SJC stated that it has "never held 'that a judge must give instructions on the claimed inadequacies of a police investigation.'"  431 Mass. at 395 (emphasis in original). The SJC declined to create such a rule in Hardy's case even though "the inadequacies of the investigation were a main theory of the defense."  Id.  Instead, it found that Hardy had adequately explored the alleged deficiencies of the police investigation at trial.  Id.  The SJC concluded that whether to give a Bowden instruction was appropriately within the trial judge's discretion.  Id.

The trial court's refusal to give a <u>Bowden</u> instruction, and the SJC's review of that decision, did not violate Hardy's constitutional guarantees.[17]  Hardy has not demonstrated that federal law required the trial court to issue a <u>Bowden</u> instruction, especially given the ample opportunity he had to present his theory of the case to the jury.  Consequently, Ground Five fails to state a basis for habeas relief.

2.   <u>Ground Nine: Consciousness Of Guilt Instruction</u>

Hardy also claims that the trial judge erred when he charged the jury with a consciousness of guilt instruction thereby reducing the Commonwealth's burden of proof.[18]

_____

[17] Under Massachusetts law, a trial judge is under no obligation to provide a <u>Bowden</u>-type instruction.  <u>Avila v. Clarke</u>, 938 F. Supp. 2d 151, 157 (D. Mass. 2013).  "[T]he obligation of the authorities to investigate a crime does not translate into a jury instruction that the authorities have a duty to gather exculpatory evidence."  <u>Id.</u> (citing <u>Commonwealth v. Martinez</u>, 437 Mass. 84, 92 (2002)).

[18] The challenged jury instruction reads in relevant part:

> There is something within our provisions that permits a jury to consider what is known as, in terminology, the consciousness of guilt. And specifically, the jury may consider whether an individual voluntarily makes, willfully, false statements or acted in a manner inconsistent with innocence as being probative of consciousness of guilt. The jury may, but need not, consider such evidence as a factor tending to prove the guilt of the defendant. But it is of primary importance that a jury cannot convict a defendant on the basis of evidence of consciousness of guilt alone, for proof of mere consciousness of guilt is insufficient to convict. But evidence of such a state of mind could be considered with other probative inferences that may be sufficient to prove guilt beyond a reasonable doubt.
>
> Nevertheless, feelings of guilt are sometimes present in innocent people. So that, either concealment or false statements, or the like, do not necessarily indicate a person is guilty. At the same time, you may consider whether or not a person makes a statement — either declines or makes a statement that is not correct, or is false, out of the basis of fear of being implicated in another crime not associated with the crime that the individual is being questioned for. All of these things the jury is entitled to weigh as to whether or not you would consider any consciousness of guilt as far as statements or false statements made by the defendant when questioned by the police in this case.

24

Docket No. 62 at 9-10.

Clearly established Supreme Court law prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime.  Figueroa v. Gelb, No. 13-13008-IT, 2016 WL 3147354, at *10 (D. Mass. Apr. 20, 2016) (quoting Francis v. Franklin, 471 U.S. 307, 313 (1985)).  The "threshold inquiry" in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine whether it creates a mandatory presumption or merely a permissive inference.  Id. (citing Francis, 471 U.S. at 313-14; County Court of Ulster County, N.Y. v. Allen, 442 U.S. 140, 156-60 (1979)).

Mandatory presumptions violate due process if they relieve the state of the burden of persuasion on an element of an offense.  Francis, 471 U.S. at 314-15.  Permissive inferences do not relieve the state of its burden of persuasion because they require the state to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved.  Id.

In Hardy II, the SJC found that the consciousness of guilt instruction "did not violate any of [Hardy's federal] constitutional rights."  Hardy II, 464 Mass. at 671.  Instead, it concluded that this instruction was a proper permissive inference because it "suggest[ed] to the jury a possible conclusion to be drawn if the State prove[d] predicate facts, but [did] not require the jury to draw that conclusion." Id. (citing Francis, 471 U.S. at 314).  The SJC explained that a jury instruction creating a permissive presumption violates due process only if the "suggested conclusion was not one that reason and common sense justify in light of the proven facts before the jury."  Id. (citing Francis, 471 U.S. at 314-15).  The SJC then determined that the facts supported a consciousness

---

S.A. at 3744-45.

of guilt instruction, and therefore did not deprive Hardy of a fair trial.  Id.

Hardy I reasoned that this instruction was proper because Hardy made false statements to the police, which are "a standard example of admissible evidence of consciousness of guilt." Hardy I, 431 Mass. at 394 (quoting Commonwealth v. Carrion, 407 Mass. 263, 276 (1990)).

The SJC's conclusions were neither contrary to nor an unreasonable application of Supreme Court precedent.  The trial judge instructed the jury that it "may, but need not" consider evidence of an individual voluntarily making willfully false statements as "a factor tending to prove" Hardy's guilt.  S.A. at 3744 (emphasis added).  As the SJC recognized, in light of relevant Supreme Court law, this instruction undeniably conveyed a permissive inference, because it allowed, but did not require, the jury to infer consciousness of guilt from the fact that Hardy lied to the police.  See Hardy II, 464 Mass. at 671 (citing Francis, 471 U.S. at 314).  The SJC found that the inference was well supported by the record.  Id.  Accordingly, Ground Nine does not provide a basis for federal habeas relief.

## V.      RECOMMENDATION

For the foregoing reasons, this Court recommends that the District Judge DENY the Petitioner Jeffrey Hardy's Petition for Writ of Habeas Corpus in its entirety.

## VI.     REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72; Habeas Corpus R. 8(b).  The parties are further advised that

the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir. 1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge